UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL ALHOLM et al., individually and on behalf of those similarly situated,

Plaintiffs,

v.

THE VRDOLYAK LAW GROUP, LLC,

Defendant.

No. 22 CV 1820

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Daniel Alholm, Jeannette Alicea, Penny Jackson, Rodney Smith, Lucero Del Real, Daniel Gallagher, and Erica Villagomez, all former employees of Vrdolyak Law Group, believe that VLG secretly recorded their telephone conversations in violation of 18 U.S.C. § 2511, section 39-13-601 of the Tennessee Code, and section 5/14-1 of chapter 720 of the Illinois Compiled Statutes. They brought class claims under those statutes, and VLG now moves for summary judgment. For the following reasons, VLG's motion is granted in small part but otherwise denied.

## I. Legal Standards

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Metzler v. Loyola Univ. Chi.*, 164 F.4th 612, 616 (7th Cir. 2026); Fed. R. Civ. P. 56(a), (c). In determining whether a genuine

issue of fact exists, the Court may not make credibility determinations or weigh the evidence. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Rather, it must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.  Facts

The following facts are taken from the parties' Local Rule 56.1 Statements of Material Fact, [50]; [52-1], and the exhibits submitted in support thereof. The Court only cites the parties' Local Rule 56.1 statements where the asserted facts are fully supported in the record and genuinely undisputed. Because many of the facts asserted in the parties' Local Rule 56.1 statements were only partially supported, and most were at least partially disputed, the Court often found it more expedient to independently examine and characterize the relevant evidence, using the parties' submissions primarily to locate the pertinent parts of the record. In those instances, the Court directly cites the underlying record materials.

On January 24, 2020, Dan Alholm caused quite a stir when he quit his job as the founding partner of Vrdolyak Law Group's Nashville office.[1] [133] ¶ 24; [125-2] at 588:30:4–21, 32:1–7.[2] He resigned via a memorandum in which he accused VLG of engaging in "illegal wiretapping." *Id.* at 851.[3] According to deposition testimony from Penny Jackson, who worked at VLG as a legal assistant at the time, *id.* at 1244:51:9–10, 1248:66:1–8, Eddie Vrdolyak, the firm's managing partner, *id.* at 455:5:4–8, "blew up" and was "furious" when she told him about Alholm's accusation, *id.* at 1269:150:11–12. According to Jackson, he immediately summoned Steve Armbruster, a senior attorney at VLG, *id.* at 400:5:4; Dalia Martinez, VLG's HR manager at the time, *id.* at 404:19:8–13, 405:23:16–18; and Grant Stoffle, VLG's controller at the time, *id.* at 337:8:7–17, to his upstairs office. *Id.* at 1269:150:8–24. While "[t]hey all sat there," he proclaimed that "Alholm was lying," "Illinois is not a two-party state," he "did not need permission from anybody to record the phone calls," and "[t]elephones at VLG were … his … fucking phones and [] he could do … whatever he wanted." *Id.* at 1269:150:24–151:11, 1270:153:11–17. This was, according to the deposition testimony of Eddie Vrdolyak; Armbruster; Stoffle; and Peter Vrdolyak, who is Eddie's brother and, like Eddie, a VLG member, *id.* at 455:2–3, the first time

---

[1] VLG also has offices in downtown Chicago, on Chicago's south side, and in Tinley Park, Illinois. [125-2] at 672:8:14–17.

[2] [125-2] is a filing containing all 32 of VLG's exhibits. Documents in that filing are cited as <ECF page number>:<exhibit page number>:<line>.

[3] This citation is to a document that defendants describe as Alholm's "resignation memorandum." [133] ¶ 24. The document is not accompanied by any authenticating affidavit, but plaintiffs do not dispute its authenticity. *Id.*

any of them had heard any accusation of phone call recording. *Id.* at 367:38:9–13, 408:37:5–14, 542:92:21–543:93:1, 675:11:13–24.

VLG sprang into action. According to testimony from Eddie and Peter Vrdolyak, Armbruster and Stoffle immediately contacted Mike Conlee, the head of SIPComm, *see id.* at 30:28:3–5, VLG's telephone platform provider, *id.* at 29:27:2–10, to find out whether its phone system had been recording its employees' calls. *Id.* at 463:13:21–464:14:9, 675:11:13–22. They say that Conlee confirmed that it was not and could not have been. *Id.* at 345:16:13–23, 409:39:4–40:4, 463:13:21–464:14:9. Next, VLG sued Alholm for defamation, among other things. [142] ¶ 20.

Word of the accusations spread among VLG employees and former employees, [132-3] at 5–15, at least some of whom say they were already on edge about privacy in the office. For instance, Jeannette Alicea, an assistant at VLG until May 2020, [125-2] at 923:11:21–924:13:13, testified that she "had always felt" that "everything [she] did was being recorded" by security cameras that VLG maintained "everywhere in that office" except "the bathroom." *Id.* at 958:149:6–19. Erica Villagomez, who worked at VLG from 2016 until September 2021, [133] ¶¶ 67, 71, also felt that she was "being watched," since there were "cameras everywhere." [125-2] at 1324:67:10–14. Dan Gallagher, a VLG attorney from March 2018 through September 2019, [133] ¶ 47, testified that Eddie Vrdolyak had a large television screen in his office showing feeds from cameras throughout the office. *Id.* at 1090:36:10–21, 1108:108:15–22.

It is unclear from the record whether the cameras had microphones for recording audio. According to Alholm, Eddie Vrdolyak fired three employees after one

called him a "fucking clown." *Id.* at 592:46:7–23. He testified that, when ordering the firing, Eddie said:

> [T]hose cameras also have microphones, and we've been recording you. So we have it on recording of [the employee] calling me a fucking clown. … I had Sean pull the tape … , and I listened to it. And she called me a fucking clown, and she's fired. I want you to fire her immediately.

*Id.* Notably, Eddie does not deny telling Alholm that the cameras had microphones, but he characterized it in his depositions as an "untruth" that he told in order to protect another employee who informed him of the insult. *Id.* at 477:27:19–480:30:8.

Gallagher also described other instances that he says gave rise to his privacy concerns. For instance, he sometimes got calls from Peter or Eddie Vrdolyak about cases that he had just been talking to his secretary about on the phone or in his office. *Id.* at 1112:121:1–13. Gallagher also testified that, a few weeks after he left VLG, a receptionist at VLG was reprimanded for talking to him on the phone when he called to ask about a folder he had left in his office. *Id.* at 1117:144:13–1118:147:21. Rodney Smith, a case and intake manager for VLG, *id.* at 1386:9:12–24, testified that he had twice been reprimanded for things he said in conversation, [133] ¶ 64, although only one of those conversations was over the phone, [125-2] at 1407:93:2–8.

Villagomez said that her privacy concerns had already led her to avoid using the phone "for personal use or private conversations," *id.* at 1333:101:9–16, and that "people didn't feel comfortable … speaking freely on the company phone," *id.* at 1323:62:22–63:4, although she admitted that it was "possibl[e]" that their discomfort was because they worked in shared spaces where they could be overheard, *id.* at 1324:64:16–19. Even so, she testified, she and others were even more fearful of using

VLG's phones after they learned of Alholm's accusation. *Id.* at 1340:129:10–13. According to Alicea and Villagomez, VLG never told its employees that their calls were being recorded, *see id.* at 963:168:21–169:20, 1343:143:1, but Smith later said that he believed Alholm because, "[l]ooking back at events, it was the only explanation for some of them." *Id.* at 1404:79:16–80:17.

The bases for Alholm's accusation, according to his resignation memorandum, were that "[o]ne employee confirmed that they recently discovered recordings of their own conversations that had been made without their consent," that "three senior level VLG employees t[old] [him] that they had listened to conversations of employees that were made without the employees' consent," and that he had "spoken to two additional employees who told [him] that phone calls [were] being recorded without the consent or knowledge of the parties involved." *Id.* at 851. He testified that the "one employee" who had "recently discovered recordings" was Chinua Gipson, VLG's intake department head until late 2019. *Id.* at 795:7:24–796:8:3, 797:9:11–14, 609:117:20–23. According to Alholm, Gipson told him on January 9, 2020, that VLG was "recording all of the phone calls in the offices now," and he could "pull them up and click on them and listen to them." *Id.* at 596:65:6–597:66:6.[4]

Other record evidence contradicts Alholm's account. Gipson testified that he never had "any conversations with [] Alholm about the firm recording telephone calls." *Id.* at 820:32:23–821:33:6. It is undisputed that Gipson sent Alholm an email

[4] Defendants contest the admissibility of Gipson's statement. As explained below in section (A)(1), Gipson's statement may not be used to prove the truth of the matter asserted but may be used for other purposes.

in February 2020 saying: "Let me be clear. At no time during my employment at VLG was I ever aware of phone calls being recorded. In fact, I don't believe in any way that the allegation is true." [133] ¶ 76. He testified similarly in his deposition. [125-2] at 815:27:11–816:28:4.

Alholm also says that Mike Conlee told him in March of 2018 or 2019, *id.* at 595:60:21–22 (2018); *id.* at 598:70:2–4 (2019), that "they were recording phone calls in [VLG's] new downtown [] office," *id.* at 591:43:13–17.[5] Alholm nevertheless maintains that his conversation with Gipson was the first time he believed VLG was illegally recording phone calls. *Id.* at 597:68:12–69:7. He says that, until he spoke with Gipson, he had believed that the recording practice Conlee mentioned had been an "innocuous mistake" that "he had just started doing with the implementation of the new phone system," *id.* at 595:61:9–19.

Conlee has a different recollection of the conversation. He says that he called Alholm to ask about the legal viability of his idea to "upsell" VLG on a call-recording feature. *Id.* at 63:61:1–64:62:8. Specifically, according to his testimony, he asked Alholm, "[I]f we wanted to do call recording for Vrdolyak, … what laws do we have to abide by?" *Id.* at 64:62:24–65:63:3. Alholm told him that he shouldn't do it, *id.* at 65:63:8, and Conlee "abandoned the whole idea," *id.* at 66:64:15.

When he quit, Alholm did not realize that, around the same time—that is, "the end of 2019 or 2020, … [r]ight before COVID," *id.* at 867:45:3–19; [132-3] at 5–15—

[5] Defendants contest the admissibility of Conlee's statement. As explained below in section (A)(2), Conlee's statement may not be used to prove the truth of the matter asserted but may be used for other purposes.

another VLG employee had found recordings of her phone calls while trying to check her voicemail. Lucero Del Real, a legal assistant for VLG at the time, [125-2] at 859:13:3–4, testified that she had set up a web portal through the website of her office phone's manufacturer, *id.* at 864:34:24–865:37:6, in order to access her voicemails using her computer, 866:42:14–43:5. When she accessed the portal a few days after setting it up, *id.* at 870:56:7–21, she discovered audio files, *id.* at 867:46:2–9; [132-3] ¶ 2, which she recognized as recordings of her phone calls., *id.* at 870:57:21–23; [132-3] at 3, ¶ 4.[6] Dean Walker, a contractor with SIPComm who helped maintain VLG's phone system, [125-2] at 1008:38:12–13, 1009:39:10–17, testified that he recognized the portal as one that would allow a user to access voicemails and any calls recorded by the phone system. *Id.* at 1472:18:18–1473:21:5.

Del Real says that she told Alicea about the recordings on the same day she discovered them. *Id.* at 870:57:1–5. Together, they listened to several audio files, and they recognized Del Real's voice, Alicea's voice, and the voices of customers, an attorney, and another coworker. *Id.* at 870:57:19–23, 871:60:19–22. "[A] couple of days later," Del Real testified, she downloaded "a few" of the audio files, but there were "too many for [her] to download" all of them. *Id.* at 872:65:5–20. In total, she downloaded 39 files and saved them to a USB drive. *Id.* at 873:68:12–69:1; [132-3] at 2 ¶ 2; *see also* [140].[7]

---

[6] VLG contests the admissibility of [132-3], but the Court deems it admissible for purposes of this motion, as explained in section (A)(4) below.

[7] VLG contests the admissibility of [140], but the Court deems it admissible for purposes of this motion, as explained in section (A)(5) below.

According to an expert retained by plaintiffs, the files on the USB drive were placed on the USB drive on June 19, 2020,[8] and the files were last modified on January 28, 2020. [125-2] at 1540; *see also id.* at 1558:41:1–20. He explained:

> Since the created date of these files appears to be after the modified date of the files, it is likely that the modified dates of 01/28/2020 is the creation date of the file as it was before being transferred to the thumb drive. The creation dates of 06/19/2020 would indicate the date the files were copied/transferred/appeared on the thumb drive.

*Id.* at 1540. In other words, January 28, 2020, "could indicate the time that the file[s] [were] created." *Id.* at 1559:42:12–16.

The evidence of whether VLG's phone system could have made the recordings in Del Real's online portal is, to say the least, mixed. Some background about VLG's phone contractor may be helpful in sorting it out. VLG contracted with SIPComm to provide it with a "voice over IP" phone system starting on November 1, 2019. *Id.* at 158:156:8–159:157:8; [132-5] at 3. SIPComm was a new company owned by Mike Conlee, who had provided other IT services to VLG but had never provided it with a phone platform. [125-2] at 28:26:9–19, 29:27:13–30:28:5. To help get SIPComm off the ground, Conlee consulted with a "buddy," Jeff Norris, *id.* at 30:28:4–17, as well as with Walker, who had worked with Conlee on previous IT ventures, *id.* at 1008:38:12–13, 39:10–17.

[8] Although Del Real no longer worked for VLG on this date, *see* [125-2] at 867:45:18–19, this expert opinion is not necessarily inconsistent with Del Real's testimony that she loaded the files onto a USB drive soon after finding them in the portal, as VLG now seems to recognize. *See* [123] at 27 ("Plaintiffs' own expert testified that the files were not copied to the *current* thumb drive until June of 2020." (emphasis added)).

SIPComm installed two different phone systems. It first installed a system that used a platform called 3CX that was relatively user-friendly but limited in its capabilities. *Id.* at 95:93:2–12, 1501:15:19–23. Eventually, though, Conlee realized that VLG's needs outstripped 3CX's capabilities, *id.* at 38:36:2–12, and he installed a system based on a platform called Asterisk, *id.* at 41:39:12–14, with a graphical interface that ran on top of Asterisk called FreePBX, [133] ¶ 2.[9] Conlee had no prior experience with Asterisk-based systems, but Norris and Walker did. *Id.* at 41:39:7–11, 1010:45:1–47:14.

Conlee, Norris, and Walker each testified about the recording features of the Asterisk platform that VLG's phone system used.[10] All three agreed that the system had a built-in call recording feature. *Id.* at 52:50:4–53:51:4, 1017:75:3–6, 1509:48:19–22. They also agreed that, for calls to be recorded systemwide, a system administrator would have to activate the feature "on the back end." *Id.* at 53:31:8–22; *see also id.* at 1018:76:12–77:12, 1510:51:10–52:3. Their testimony diverges with respect to whether call recording could be activated for individual phone lines. Conlee said that call recording could only be activated system-wide. *Id.* at 53:51:8–22. Norris said that the

[9] Although plaintiffs purport to dispute [133] ¶ 2, they do not dispute that FreePBX is a graphical user interface running on top of Asterisk.

[10] Plaintiffs object to Conlee's testimony regarding the capabilities of VLG's 3CX- and Asterisk-based phone systems on the ground that Conlee is not an expert on telecommunications systems. *See, e.g.*, [133] ¶ 1. But they also cite his testimony about the systems' capabilities in their own Statement of Undisputed Material Facts. *See, e.g.*, [142] ¶ 9. They have therefore waived their objection to Conlee's testimony for purposes of summary-judgment proceedings. *See United States v. Saunders*, 359 F.3d 874, 877 (7th Cir. 2004) (a party's introduction of evidence waives any objection to the evidence, even if a contemporaneous objection was made).

system could record individual extensions, but for that to happen, the end user would have to activate recording at the start of every call by dialing a specific key code. *Id.* at 1505:33:14–1506:34–3, 1510:52:4–15. Dean Walker said that call recording "could have just been turned on for [a user's] extension only." *Id.* at 1030:125:17–19; [133] ¶ 80.

Whatever recording features Asterisk may have had, Conlee said that he never activated them, [125-2] at 53:51:10–11, 233:231:3–5, and would not have done so without written permission from Eddie Vrdolyak, *id.* at 55:53:19–57:55:13, permission that—according to Conlee, Eddie Vrdolyak, and Stoffle—Conlee never received, *id.* at 57:55:15–23, 372:43:2–373:44:1, 491:41:4–18, 546:96:13–16. Conlee also maintained that the hardware supporting VLG's system (as opposed to the Asterisk platform) was incapable of recording calls systemwide because it lacked the storage capacity and processing power to record VLG's high volume of calls. *Id.* at 46:44:8–17, 232:230:16–18.

Wherever the origin of Del Real's call recordings, Alholm apparently contemplated filing this lawsuit before he knew of them. The record suggests that Alholm first learned that Del Real had audio files of 39 recorded calls sometime around August 18, 2022. *Id.* at 884:113:12–114:20, 885:117:9–118:15, 1075–76. Eight months before that, on January 8, 2022, he and VLG agreed to toll the limitations period on any federal Wiretap Act claims or similar state-law claims brought by Alholm on behalf of himself and a class of similarly situated individuals from January

8, 2022, until March 9, 2022.[11] [142] ¶ 24; [132-6] at 2–3 ¶ 2. On March 4, 2022, the parties extended the tolling period until April 7, 2022. [142] ¶ 24; [132-7] at 2–3 ¶ 2. Alholm filed this class-action lawsuit on April 7, 2022. [1].

Del Real, Alicea, Smith, Gallagher, Villagomez, and Jackson eventually joined Alholm as named plaintiffs, filing an amended complaint on August 12, 2023. [53]. In that complaint, they brought class claims against VLG for illegal wiretapping under 18 U.S.C. § 2511 and section 39-13-601 of the Tennessee Code, and for illegal eavesdropping under section 5/14-1 of chapter 720 of the Illinois Compiled Statutes. [53] at 12–13, 15. Alholm also brought an individual claim for misappropriation of likeness under section 47-25-1101 of the Tennessee Code. [53] at 17. VLG now moves for summary judgment on all three class claims. [123].

## III. Analysis

VLG believes the Court should grant summary judgment in its favor, arguing that plaintiffs' claims fail on the merits and that they are time-barred. The Court will address each argument after first addressing evidentiary issues raised by the parties.

### A. Some Evidentiary Issues

#### 1. Gipson Statement

Plaintiffs assert that, early in 2020, Chinua Gipson, who had recently left VLG's employ, told Alholm that VLG had been recording all phone calls made in its

[11] The agreement says that the tolling period begins "on the date of signing this Agreement." [132-6] at 2 ¶ 2. The agreement was signed on January 8, 2022. [132-6] at 5. Yet the agreement also says that any suit asserting such claims filed within the tolling period "shall have the same legal effect with respect to limitations and repose as if it were filed on or before January 8, 2021." *Id.* at 3–4 ¶ 2. Nevertheless, neither party argues that claims should be tolled starting on January 8, 2021, as opposed to January 8, 2022. *See* [131] at 24; [141] at 5.

office. [131] at 8; [133] ¶ 18. VLG argues that Gipson's statement should be excluded as hearsay. [123] at 22. Plaintiffs contend that Gipson's statement, though hearsay, is admissible under Rule 807, which creates an exception to the rule against hearsay for any statement that is (1) "supported by sufficient guarantees of trustworthiness" and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," Fed. R. Evid. 807. [131] at 23.

Plaintiffs say Gipson's statement is supported by sufficient guarantees of trustworthiness for two reasons. [131] at 23. *First*, Gipson had recently been employed by VLG at the time of the statement, making Gipson's statement "nearly non-hearsay" under Federal Rule of Evidence 801(d)(2)(D). *Id.* Under that rule, an out-of-court statement offered against an opposing party is not hearsay if it "was made by the party's … employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). *Second*, they say, the statement is corroborated by the existence of 39 recordings of calls from the phone of another VLG employee, Del Real. [131] at 23.

Plaintiffs do not explain, nor does the Court see, why it matters that Gipson nearly satisfies Rule 801(d)(2)(D)'s requirements. Rule 801(d)(2)(D) is not an *exception* to the hearsay rule; statements satisfying its demands are not hearsay to begin with. The distinction is not without difference.

The exceptions to the rule against hearsay "usually are justified on the ground that evidence meeting the requirements of the exception possesses special reliability

and often special need." Kenneth S. Broun et al., *McCormick on Evidence* § 254 (9th ed. 2025). Those justifications, more or less spelled out in Rule 807, apply to the residual exception at issue here. But they do not apply to statements that are non-hearsay under Rule 801(d)(2). *See id.* "[A]dmissions[12] need not satisfy the traditional requirement for hearsay exceptions that they possess circumstantial guarantees of trustworthiness" as they "are outside the framework of hearsay exceptions." *Id.* Rather, the admissibility of those statements is "the product of the adversary system." *Id.*

That distinction means that the fact of Gipson's employment by VLG—even if it had been ongoing, rather than, as here, recent—has no bearing on the trustworthiness of his statement. Thus, that Gipson's statement is *nearly* non-hearsay under Rule 801(d)(2)(D) is irrelevant to the Rule 807 analysis, which focuses on trustworthiness and need.

As discussed below, the existence of 39 recordings of Del Real's phone calls does to some extent corroborate Gipson's statement. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 226, "corroborate" (3d ed. 2011) ("to support (a statement, argument, etc.) with evidence that is consistent"). But corroboration is "not dispositive of[] whether a statement should be admissible" under Rule 807. Fed. R. Evid. 807, Committee Notes on 2019 Amendment. The Court also must consider, along with that corroborating evidence, "the totality of circumstances under which

[12] Opposing parties' statements under Rule 801(d)(2)(D) have historically been called "admissions." *Id.*

[the statement] was made." Fed. R. Evid. 807(a)(1). The Seventh Circuit has compiled a non-exhaustive list of circumstances that may be relevant, including "the knowledge and qualifications of the declarant; … the extent to which the witness' testimony reflects his personal knowledge; … [and] whether the witness ever recanted his testimony." *United States v. Hall*, 165 F.3d 1095, 1110–11 (7th Cir. 1999) (discussing Rule 807's predecessor).

The record has no evidence suggesting that Gipson had any knowledge or qualifications lending trustworthiness to his statement. Gipson testified in his deposition that he worked for VLG for just under seven years, [125-2] at 797:9:6–10, in a variety of roles, including running mail, working as a case manager, and working in the intake department, *id.* at 798:10:8–23. But, during that time, he was not involved in and had no knowledge about the installation of VLG's phone system, *id.* at 817:29:21–30:6, and he did not know whether VLG's phone system could record calls, *id.* at 820:32:7–10.

Gipson's deposition testimony also suggests that had no personal knowledge that VLG was recording calls. He testified that he was not aware of any recording of telephone calls when he worked at VLG, *id.* at 815:27:11–14; he never heard the subject discussed when he worked there, *id.* at 815:27:15–18, 818:30:7–12; and he never saw evidence of telephone recordings when he worked there, *id.* at 817:29:14–20. And in his deposition, Gipson denied that he ever told Alholm that VLG had been recording phone calls made in its office or even discussed call recordings with Alholm. *Id.* at 820:32:23–821:33:10.

The Court therefore concludes, "after considering the totality of the circumstances under which [Gipson's statement] was made and evidence … corroborating the statement," that Gipson's statement to Alholm is not "supported by sufficient guarantees of trustworthiness" for admissibility under Rule 807. Fed. R. Evid. 807(a)(1).

Nor is the statement "more probative on the point for which it is offered than any other evidence that [plaintiffs] can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). Plaintiffs say that it is, because "no evidence of the conversation exists other than Mr. Alholm and Mr. Gipson's testimony." [131] at 23. Setting aside the fact that Gipson testified that the conversation never happened, plaintiffs offer Gipson's statement as evidence that VLG was recording calls; the fact that the statement supposedly occurred during a conversation between Gipson and Alholm is merely incidental. And there is plenty of other evidence that is at least as probative on the question of whether VLG was recording calls, as detailed below.

Gipson's statement is hearsay and is not excepted under Rule 807. It is therefore inadmissible to prove the truth of the matter asserted: that VLG had been recording all phone calls made in its office. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). As the Court discusses later in this opinion, Gipson's statement can still be used to assess when Alholm had notice of his claims. *See* Fed. R. Evid. 801(c)(2).

**2. Conlee Statements**

Plaintiffs ask the Court to consider an out-of-court statement by Conlee that "[w]e are recording calls … with the new phone system in the downtown [Chicago]

office." [125-2] at 594:57:24–595:58:2. VLG believes that the statement should be excluded as hearsay. [123] at 22. Plaintiffs disagree, arguing in an incredibly conclusory fashion that "[t]he hearsay rule should not bar evidence of statements by … [SIPComm]'s Conlee." [131] at 23. But the Court need not consider their "perfunctory and undeveloped" argument, which includes no pertinent authority, facts, or evidence. *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017). It therefore does not consider Conlee's out-of-court statement to Alholm for the truth of the matter asserted. Fed. R. Evid. 801(c)(2); *Cairel*, 821 F.3d at 830.

### 3. Penny Jackson Texts

Plaintiffs ask the Court to consider screenshots of text messages between—try to keep up, now—plaintiff Penny Jackson and Alholm, in which Penny Jackson purported to recount statements made to her by Kenny Jackson (a former case manager for VLG, [142-4] at 10:8:1–21), in which Kenny Jackson purported to recount statements made to him by Benjamin Kelly (an attorney at VLG, [142-4] at 15:13:3–5).[13] [131] at 20 n.5, 23; [142] ¶ 29. VLG says that the text messages are inadmissible hearsay. [142] ¶ 29.

Plaintiffs say that the messages are recorded recollections, which are excepted from the rule against hearsay under Rule 803(5). [131] at 23. That rule allows a record to be read into evidence if it "(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by

[13] Even though, as discussed below, the screenshots are not accompanied by an authenticating affidavit or declaration, VLG does not dispute that they are of a text exchange between Penny Jackson and Alholm. [142] ¶ 29.

the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge." Fed. R. Evid. 803(5). The purported screenshots do not satisfy those requirements.

At summary judgment, the proponent of a recorded recollection record must show that the declarant—the person who created or adopted the record—can lay the proper foundation at trial. *See King v. Ind. Harbor Belt R.R.*, No. 2:15-CV-245 JD, 2018 WL 5982134, at *4 (N.D. Ind. Nov. 13, 2018). It can do so using an affidavit, *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020), or a transcript of sworn testimony, *see Tarochione v. Roberts Pipeline, Inc.*, 62 F. Supp. 3d 821, 828 (N.D. Ill. 2014), showing that the record satisfies Rule 803(5), *Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998).

Here, the screenshots are not accompanied by an affidavit or a declaration laying the necessary foundation. Nor is the deposition testimony of the declarant adequate. The texts purport to record a conversation that Penny Jackson had with Kenny Jackson, but she testified extensively about that conversation in her deposition. [125-2] at 1255:92:8–1256:96:23. The texts are therefore not "on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately." Fed. R. Evid. 803(5)(A).

Even if the texts satisfied Rule 803(5), they would not be helpful to plaintiffs; the relevant statements in them are inadmissible hearsay separate from the texts themselves. Rule 803(5) creates a hearsay exception for the record itself—here, the texts—but not for additional layers of hearsay contained within the record. Those are

admissible only if each layer conforms with a hearsay exception. *See* Fed. R. Evid. 805.

The texts (the first layer of hearsay) purport to convey statements made by Kenny Jackson to Penny Jackson (the second layer of hearsay), which in turn purport to convey the content of a conversation between Kenny Jackson and Benjamin Kelly (the third layer of hearsay). Plaintiffs have not identified any hearsay exceptions that would make the second or third layers admissible.[14] *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 883 (7th Cir. 2016) ("'Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged statement but was later told by another that the statement was made, such testimony is rejected as hearsay' on summary judgment.") (quoting *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007)).

Because the Penny Jackson texts are hearsay and not subject to any exception, the Court will not consider them. *Cairel*, 821 F.3d at 830.

**4. Del Real Declaration**

Plaintiffs have submitted a declaration from Del Real in which she stated, among other things, that (1) she "discovered recordings of telephone calls using an online portal on [her] desktop computer at Vrdolyak Law Group," [132-3] ¶ 2; (2) she downloaded 39 of the calls to a computer and saved them to a USB drive, *id.*; and (3) she "listened to the audio files and recognize[d] them to be true and accurate

[14] The Court notes that neither Penny Jackson nor Kenny Jackson were employed by VLG at the time of their purported conversation. The conversation occurred in 2023. *See* [125-2] at 1229, 1255:95:12–18. Penny Jackson left VLG in late 2022. *See* [125-2] at 1237:22:3–5. Kenny Jackson left VLG sometime in late 2022 or before. *See* [142-4] at 2, 8:6:3–6.

recordings of telephone calls involving [her]self and [her] former co-workers," *id.* ¶ 4. VLG says the Court should ignore the declaration because it contradicts Del Real's "vague" deposition testimony. [141] at 21. True, the Court may strike an affidavit or declaration that contradicts the affiant's prior deposition testimony. *Donaldson v. Johnson & Johnson*, 37 F.4th 400, 406 (7th Cir. 2022). But there is no such contradiction here.

Del Real's deposition testimony was, as VLG notes, hazy on the details of how she found the recordings. *See, e.g.*, [125-2] at 868:50:11–51:15; *id.* at 869:54:17–55:3; *id.* at 871:63:16–872:64:15. But Del Real's declaration does not contradict or even attempt to fill in those details. It simply says that she discovered the recordings "using an online portal on [her] desktop computer." [132-3] ¶ 2. That statement sits comfortably alongside her earlier account. *See, e.g.*, [125-2] at 867:46:2–9 ("So I was trying to access my voicemail, and … I came across other recordings, and so that's why I called her and told her that I had the portal, that … I saw the other recordings, and I let her know because I heard the recordings of … Dora and I, and some other people that we were being recorded.").

The same goes for another contradiction VLG claims. Del Real declared that she had "listened to the audio files and recognize[d] them to be true and accurate recordings of [her] telephone calls." [132-3] ¶ 4. At her deposition, she said that she "did not listen to each" recording when she downloaded them, except "just to hear [her] voice." [125-2] at 874:73:11–13. Those statements can both be true. Del Real had

plenty of time to listen to all 39 recordings during the nearly six years between downloading the recordings and signing the declaration. *See* [132-3] ¶ 2; *id.* at 2.

Because there is no contradiction between Del Real's declaration and her prior testimony, the Court will consider the declaration in resolving VLG's motion.

**5. Del Real Recordings**

Plaintiffs have submitted the 39 digital audio files that Del Real described in her declaration, [132-3] ¶¶ 4–5. [140]. VLG says that those files may not be "used to avoid dismissal or summary judgment" because they cannot be properly authenticated. *See* [123] at 24.

But Del Real's declaration and deposition testimony are sufficient to authenticate the 39 audio files as recordings of Del Real's telephone conversations. *See Steffek*, 948 F.3d at 769; *Tarochione*, 62 F. Supp. 3d at 828. Authentication requires "evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a); *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001). The Seventh Circuit has assumed without deciding that authentication of a recording in a civil case requires "clear and convincing evidence" of the recording's "truth, accuracy, and authenticity." *Id.* The proponent of a recording can satisfy that standard with evidence of the recording's chain of custody or with other evidence of the recording's accuracy and trustworthiness. *United States v. Cunningham*, 462 F.3d 708, 713 (7th Cir. 2006). For instance, a witness can authenticate a recording of a conversation by identifying the voices of the recorded conversation's participants. *Weber v. Pierce Cnty. Dep't of Hum. Servs.*, No. 21-CV-

300-WMC, 2022 WL 4103931, at *1 (W.D. Wis. Sep. 8, 2022) (citing *Smith*, 242 F.3d at 741).

Here, Del Real said that she listened to the recordings and recognized them as recordings of her phone calls. [132-2] ¶ 4; [125-2] at 870:57:21–23. She recognized her own voice in each of the calls and, in at least two other calls, the voices of the other participants. [125-2] at 870:59:14–871:60:22, 871:63:1–3. This testimony is sufficient to authenticate the audio files as recordings of Del Real's telephone conversations.

VLG disagrees. It would like the Court to assess the recordings' authenticity using a seven-element test from *United States v. McKeever*, 169 F. Supp. 426 (S.D.N.Y. 1958), rather than the more flexible test from *Smith*, 242 F.3d at 741. [123] at 24–25. But the Seventh Circuit has explicitly "eschewed any formalistic approach to the admission of tape recordings or copies thereof." *Stringel v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 420 (7th Cir. 1996). It has only cited *McKeever* once—when it declined to adopt its "rather formal, seven-step checklist." *Id.*

Further, many of the elements in the *McKeever* test are most relevant when the recording serves as evidence of a conversation's contents. Such elements include the competence of the recording device operator and whether the recorded conversation was made without any kind of inducement. *McKeever*, 169 F. Supp. at 430. Here, what matters about the recordings is not the contents of the recorded conversations but that they exist at all and that the speakers are identifiable. Thus, the Court needn't take instruction from the *McKeever* test or concern itself with VLG's analysis under that framework. [123] at 26–28.

VLG also contends that the Court should require plaintiffs to put forth expert testimony showing "the 'absence of material deletions, additions, or alterations in the relevant portions of the recordings.'" *Id.* at 26 (quoting *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977)). But the Court is not bound by the three out-of-circuit cases that VLG uses to support its argument. *See* [123] at 26 (citing *Biggins*, 551 F.2d at 66; *Buren v. Crawford Cnty.*, 13-CV-14565, 2016 WL 5369597, at *2 (E.D. Mich. Sep. 26, 2016); and *United States v. Wardlow*, 977 F. Supp. 1481, 1483 (N.D. Ga. 1997)). It is, however, bound by the Seventh Circuit's unflinchingly flexible authentication standard, that recordings are "shown to be what [they] purport[] to be." *United States v. Dawson*, 425 F.3d 389, 393 (7th Cir. 2005).

Under that standard, plaintiffs here need not prove "the absence of material deletions, additions, or alterations in the relevant portions of the recording[s]." *Biggins*, 551 F.2d at 66. The courts that have required such proof did so to ensure that admitted recordings were "accurate reproduction[s] of relevant sounds." *See id.* But, here, Del Real's recordings are relevant because of their sheer existence and their metadata, not because of what was said in the recorded conversations. In other words, there are no "relevant sounds" outside of those Del Real needs to determine that the recorded conversations are her telephone conversations. VLG does not argue that those sounds have been edited. *See* [123] at 27 (arguing that Del Real "modified" and "change[d]" the recording files by downloading multiple copies of some of the files and deleting duplicates).

VLG also believes that plaintiffs' evidence is inadequate even under *Smith*'s more flexible test. [141] at 10. It first argues that Del Real's declaration is inadequate because it is "self-serving" and not as detailed as the testimony in *Smith*, 242 F.3d 740. [141] at 8, 10. But "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). That fact "must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.*

And that Del Real's declaration is less detailed than the testimony in *Smith* is no matter. It is sufficient to establish that the files are recordings of Del Real's telephone conversations. *See Weber*, 2022 WL 4103931, at *1. VLG lists all the facts that plaintiffs might use the recordings to prove, as if to suggest that plaintiffs must submit additional evidence of those facts in order to authenticate the recordings. [141] at 10–12. That is exactly backwards. The authentication inquiry asks if there is enough evidence "to support a finding that the item is what the proponent claims it is" (here, recordings of telephone conversations Del Real had)—not whether there is enough evidence to support whatever facts the proponent will use the item to prove. Fed. R. Evid. 901.

### B. The Merits of Plaintiffs' Claims

VLG believes that plaintiffs have failed to produce sufficient evidence to support their wiretapping and eavesdropping claims. Chapter 119 of Title 18 of the

United States Code, 18 U.S.C. §§ 2510–23, commonly known as the Wiretap Act,[15] generally prohibits intentionally intercepting oral conversations. 18 U.S.C. § 2511(1)(a); *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010). The word "intercept" includes "the … acquisition of the contents of any … oral communication" using "any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). So, to succeed on their Wiretap Act claims, plaintiffs must prove that VLG (1) intentionally (2) acquired the (3) contents of (4) their oral communications (5) using a device. *See* 18 U.S.C. §§ 2510(4), 2511(1)(a); *see also Stein v. Edward-Elmhurst Health*, No. 23-CV-14515, 2025 WL 580556, at *3 (N.D. Ill. Feb. 21, 2025) (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015)). The same is true of their claims under the Tennessee wiretap statute, which is "virtually identical to its federal counterpart." *State v. King*, 437 S.W.3d 856, 866–67 (Tenn. Crim. App. 2013). Similarly, the Illinois's eavesdropping statute prohibits "knowingly and intentionally" using an "eavesdropping device, in a surreptitious manner, for the purpose of overhearing … or recording … any private conversation" without the consent of all the parties to the conversation. 720 ILCS 5/14-2(a)(1), (2).

VLG contends that plaintiffs' wiretap and eavesdropping claims fail on the merits because plaintiffs have not presented sufficient evidence of (1) VLG's

[15] Courts sometimes refer to Chapter 119 as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *United States v. Scott*, 731 F.3d 659, 663 n.1 (7th Cir. 2013), or Title I of the Electronic Communications Privacy Act of 1986, *John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1009 (7th Cir. 2018).

intentional conduct; (2) the number and dates of discrete violations; (3) the device used to make the recordings; and (4) the surreptitious manner of recording. The Court addresses each contention in turn.

**1. VLG's Conduct and Its Intentional Nature**

Plaintiffs' wiretap and eavesdropping claims—under all three statutes: federal, Tennessee, and Illinois—require intentional conduct. *See* 18 U.S.C. § 2511(1)(a); Tenn. Code Ann. § 39-13-601(a)(1)(A) (2026); 720 ILCS 5/14-2(a)(1), (2). VLG argues that plaintiffs "have no evidence to support a claim that VLG intentionally intercepted a phone call." [123] at 20. In making that argument, it attempts to bat away all of plaintiff's evidence, which is circumstantial—that is, it supports their claim by inference rather than directly, *see Sylvester v. SOS Child.'s Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)—by asserting that "[i]ntent cannot be based on inference." [123] at 20 (citing *In re HIPAA Subpoena*, 961 F.3d 59, 66–67 (1st Cir. 2020)). That assertion, if true, means that none of plaintiffs' evidence counts for the intent element of their claims.

But it is not true; it is unhelpful and inappropriate to distinguish circumstantial evidence from other evidence. *See Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) ("Whether a plaintiff offers direct or circumstantial evidence … , … all evidence belongs in a single pile and must be evaluated as a whole." (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)); Committee on Pattern Civil Jury Instructions of the Seventh Circuit, Federal Civil Jury Instructions of the Seventh Circuit, at 17 (2017), 7th_cir_civil_instructions.pdf ("The law makes no distinction between the weight to

be given to either direct or circumstantial evidence. … In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.”). Indeed, circumstantial evidence is often the only available evidence of an intentional interception. *McCann*, 622 F.3d at 752. Even the case VLG cites in support of its argument, *In re HIPAA Subpoena*, assumes that evidence supporting an inference of intent can be sufficient. *See* 961 F.3d at 68 (“Nor is there any evidence in the record … from which it could be inferred that the continued recording was the result of [defendant’s] conscious objective.”). That case contains nothing suggesting otherwise.

Plaintiffs here have presented enough evidence, circumstantial though it may be, to support a reasonable inference that VLG recorded their telephone calls and did so intentionally. For an interception to be “intentional,” it “must have been the result of defendant’s conscious objective rather than the product of a mistake or an accident.” *Narducci v. Vill. of Bellwood*, 444 F. Supp. 2d 924, 935 (N.D. Ill. 2006) (quoting *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993)). Evidence of intent must be connected to the defendant’s conduct by something more than speculation or conjecture. *Bowden v. Kirkland & Ellis LLP*, 432 F. App’x 596, 600 (7th Cir. 2011).

For instance, in *Bowden*, the Seventh Circuit affirmed summary judgment against plaintiffs who alleged that their former employer had intercepted calls they made from their personal phones in violation of the Wiretap Act. *Id.* at 598. Plaintiffs said that the interception was shown by call logs from their work phones that included records of calls that they believed they had made using their personal

phones, and by personal phone bills that did not include the suspect calls. *Id.* Testimony from their expert witnesses established a mere "theoretical possibility" that those discrepancies could have been caused by the employer's unlawful interception of the calls; there was no evidence pointing to any actual conduct by the defendant. *Id.* at 600. Likewise, the district court noted that plaintiffs "produced no tapes or records that any calls were monitored," and "provide[d] little more than conclusory speculation in support of their claims" that the defendant had access to the "highly sophisticated and expensive equipment" that would be needed to monitor their personal phones. *Grey v. Kirkland & Ellis LLP*, Nos. 07 C 975, 07 C 978, 07 C 979, 2010 WL 3526478, at *8–9 (N.D. Ill. Sep. 2, 2010).

The evidence here can establish more than "a theoretical possibility" that VLG recorded plaintiffs' calls and did so intentionally. *See Bowden*, 432 F. App'x at 600. Del Real said that, while perusing a portal on her desktop computer, she found recordings of her calls, which she downloaded and saved to a USB drive. [125-2] at 867:46:2–9, 873:68:12–69:1; [132-3] ¶ 2. Alicea testified that Del Real showed her the portal and played some of the recordings for her, [125-2] at 933:50:2–934:52:14, 53:12–55:21, and that she watched Del Real download at least one file to a USB drive, *id.* at 936:60:4–62:21. Additional testimony from Conlee connects those recordings to VLG's conduct. For instance, he testified that VLG's Asterisk-based phone system had a built-in call recording feature, *id.* at 52:50:4–53:51:4; that call recording could only be activated "on the back end" and system-wide, *id.* at 53:31:8–22; and that he only would have activated call recording at the written request of Eddie Vrdolyak, *id.*

at 55:53:19–57:55:13. The connection is bolstered by Walker's testimony that he recognized the portal Del Real accessed as one that would give a user access to any calls recorded by VLG's phone system. *Id.* at 1472:18:18–1473:21:5. This evidence could lead a reasonable jury to conclude that VLG's telephone system recorded not only Del Real's calls, but all the calls made over the system, and that it did so at the direction of VLG's leadership.

There is additional evidence of VLG's intent to record calls made over its phone system.[16] For example, according to Alicea, there were cameras "everywhere in that office" except "the bathroom," *id.* at 931:42:6–14, and, according to Gallagher, Eddie Vrdolyak monitored the cameras from his office, *id.* at 1090:36:10–17. Alholm testified that Eddie Vrdolyak said that the cameras "also have microphones" and fired three employees based on a recorded comment they had captured. *Id.* at 591:45:22–592:46:23.[17] Additionally, per Penny Jackson, when she told Eddie Vrdolyak that Alholm had accused VLG of recording calls, Eddie Vrdolyak proclaimed that VLG's phones were "his fucking phones," *id.* at 1270:153:13–21, and that "[h]e did not need permission from anybody to record the phone calls," *id.* at 1269:151:7–8.

From this evidence, a reasonable jury could infer that VLG's leadership had a history of intentionally monitoring its employees and that its call recording was "the

[16] Some of the evidence in this paragraph would be inadmissible propensity evidence if used to prove VLG's conduct, *see* Fed. R. Evid. 404(a)(1) and 404(b)(1), but it may be used for other purposes, such as proving intent or an absence of mistake, *see* Fed. R. Evid. 404(b)(2).

[17] Yes, Eddie Vrdolyak later testified that this statement was an "untruth." [125-2] at 477:27:19–480:30:8. At this stage, though, the Court does not "make credibility determinations or weigh the evidence" to resolve factual disputes. *Johnson*, 892 F.3d at 893.

result of defendant's conscious objective rather than the product of a mistake or an accident." *Narducci*, 444 F. Supp. 2d at 935. Plaintiffs have therefore produced enough evidence to enable a reasonable jury to conclude that VLG intentionally intercepted plaintiffs' phone calls using its Asterix-based phone system.

VLG accurately points out that there is evidence pointing the other way. [123] at 20–21. Norris testified that VLG's phone system could record a call on an individual phone line if the user of the line dialed a specific key code during the call. [125-2] at 1505:33:16–1506:34–3. Walker testified that call recording "could have just been turned on for [Del Real's] extension only." *Id.* at 1030:125:17–19. Additionally, Conlee testified that VLG never asked him to activate its phone system's call-recording function, *id.* at 57:55:15–23; the function had never been activated, *id.* at 53:51:10–11, 233:231:3–5; and the phone system lacked the storage capacity and processing power to record VLG's high volume of calls, *id.* at 46:44:8–17, 232:230:16–18. Members of VLG's senior leadership also testified that they never authorized the recording of calls. *Id.* at 372:43:2–373:44:1; 491:41:4–18; 546:96:13–16.

But this evidence just means that there is a genuine factual dispute as to whether VLG intercepted plaintiffs' calls and did so intentionally; it does not negate the evidence that plaintiffs produced or render it insufficient, such that judgment as a matter of law in VLG's favor is warranted. *See Johnson*, 892 F.3d at 893.

### 2. The Number of Discrete Violations

VLG next argues that, since the only recordings plaintiffs have produced are the 39 that Del Real says she downloaded from a portal on her work computer, "five of the seven Plaintiffs … have no evidence that any electronic communication of theirs

was ever intercepted by the Firm or that the Firm ever attempted to intercept a communication." [123] at 28. But, since, as discussed above, there is evidence that call recording could only be activated systemwide, a reasonable jury could infer from the 39 recordings of Del Real's calls that VLG had been recording all calls made over its phone system—including those of the other plaintiffs.[18]

VLG also contends that plaintiffs' evidence is inadequate because it does not establish how many of each plaintiff's calls were recorded or when. [123] at 28. Without such evidence, it suggests, plaintiffs cannot receive damages, because "the penalty … can be based on each occurrence." [123] at 28–29 (citing 18 U.S.C. § 2511(5)(b)). The problem with that argument is that the Wiretap Act does not impose specific penalties for each intercepted communication. Rather, it allows plaintiffs to recover "the greater of (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(c)(2). In other words, a plaintiff who proves that their calls were illegally intercepted for some period can recover a minimum of $10,000 under the Wiretap Act regardless of how many calls were intercepted or when each call was intercepted. *See id.* The subsection of 18 U.S.C. § 2511 that VLG says imposes per-"occurrence" penalties, 18 U.S.C. § 2511(5)(b), has nothing to do with

[18] Plaintiffs contend that VLG failed to adequately preserve evidence of other recordings when it allowed SIPComm to erase and repurpose the servers that had previously been used for its phone system, *id.* at 43:41:18–44:42:8. *See, e.g.*, [133] ¶ 4. But plaintiffs have not formally asked the Court to make an adverse finding against or otherwise to sanction VLG. The Court need not do so now, since it is already required at this stage to draw all reasonable inferences in plaintiffs' favor. *Bennington*, 275 F.3d at 658.

damages to be awarded to plaintiffs; it sets the amount for civil fines that a court can impose each time a defendant violates an injunction under 18 U.S.C. § 2511(5).

### 3. The Device Used to Make the Recordings

VLG's argument that "there is no evidence of any kind identifying what device was used to make any of the alleged recordings," [123] at 18, is also unavailing. Del Real testified that she found recordings of her calls in a portal that she accessed through her work computer. [132-3] ¶ 2; [125-2] at 867:46:2–9. Walker testified that he recognized the portal Del Real accessed as one that would allow a user to access voicemails and any calls recorded by VLG's phone system. [125-2] at 1472:18:18–1473:21:5. A reasonable jury thus could conclude that VLG's phone system made the alleged recordings.

But is the phone system a "device" under the Wiretap Act? The Act defines "electronic, mechanical or other device" broadly, as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5). It includes a few exceptions, one of which, "for interceptions made in the 'ordinary course of business,'" could be relevant here. *Amati v. City of Woodstock*, 176 F.3d 952, 954 (7th Cir. 1999) (quoting 18 U.S.C. § 2510(5)(a)(i)). That exception applies "if Defendants can establish that (1) the recording device used was a 'telephone or telegraph instrument' furnished by a 'provider of wire or electronic communication service in the ordinary course of its business' ... ; and (2) Defendants used the device 'in the ordinary course of [their] business.'" *Burrow v. Sybaris Clubs Int'l, Inc.*, No. 13 C 2342, 2013 WL 5967333, at *2 (N.D. Ill. Nov. 8, 2013) (quoting 18 U.S.C. § 2510(5)(a)(i)).

VLG mentions the exception, citing one case to support the proposition that the Wiretap Act's definition of "device" excludes "devices used in the ordinary course of business." *See* [123] at 19 (citing *United States v. Szymuszkiewicz*, 622 F.3d 701, 706–07 (7th Cir. 2010)). But VLG does not engage with the exception's rather specific statutory requirements or their application to the facts of this case. *See* [123] at 18–19; [131] at 22. It merely cites *Szymuszkiewicz*, which, other than quoting the Act's definition of "device," does not expound on, apply, or even mention the ordinary-course-of-business exception. *See* 622 F.3d at 706–07. The Court need not seriously consider this undeveloped argument. *See Cisneros*, 846 F.3d at 978; *see also Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) ("The moving party bears the initial burden of demonstrating that [Rule 56's] requirements have been met.") (citing *Celotex*, 477 U.S. at 323).

Instead of engaging with the Wiretap Act's ordinary-course-of-business exception, VLG contends that plaintiffs' evidence cannot establish that its phone system is a "device" because the system was not "designed with a surreptitious purpose." [123] at 19. This argument falls flat. The Wiretap's definition of "device" contains no "surreptitious-purpose" requirement, and VLG has presented no authority suggesting otherwise.

It cites two cases to support its argument, but neither help. [123] at 19 (citing *United States v. Pritchard*, 745 F.2d 1112, 1114 (7th Cir. 1984), and *United States v. Wynn*, 633 F. Supp. 595, 602 (C.D. Ill. 1986)). They both depend on application of a different part of the Wiretap Act that is not relevant here. In *Pritchard*, the court

considered whether a search warrant was properly issued for the seizure of items prohibited by § 2512 of the Wiretap Act, "devices primarily used for the surreptitious interception of wire or oral communications." 745 F.2d at 1121. It did not involve § 2511, which governs the alleged conduct in this case, or § 2510, which provides the relevant definitions. And nothing in the statutory text suggests that § 2512's surreptitious-purpose requirement bears on the construction of § 2510 or § 2511. Neither section contains the word "surreptitious." *See* 18 U.S.C. §§ 2510–11. And § 2512, which does, uses it to limit the category of prohibited "electronic, mechanical, or other device[s]," a term that is itself defined in § 2510. So, reading a surreptitious-purpose element into the Act's definition of "device" would be contrary to the plain meaning of §§ 2510 and 2511 and would render § 2512's modification of "device" superfluous. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (noting the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute"). *Wynn*, like *Pritchard*, involved application of § 2512 and not § 2510 or § 2511. *See Wynn,* 633 F. Supp. at 596–97.

Having set aside the exceptions to the Wiretap Act's definition of "device," the Court considers whether plaintiffs have presented enough evidence to establish that VLG's phone system is "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(5). They have. Conlee and Norris both testified that VLG's Asterisk-based phone platform had a call recording feature. [125-2] at 52:50:4–53:51:4, 1509:48:19–22. Conlee also offered testimony suggesting the 3CX platform had the feature. *Id.* at 142:140:2–8, 143:141:16–21,

145:143:5–9, 146:144:8–16, 204:202:4–205:203:10. That is enough for a reasonable jury to conclude that VLG's phone system could "be used to intercept" a telephone conversation and is therefore an "electronic, mechanical, or other device" under the Wiretap Act. 18 U.S.C. § 2510(5).

**4. The Surreptitious Manner of Recording**

VLG returns to the surreptitious-purpose requirement in its reply brief, but instead of arguing that it is somehow contained within the Wiretap Act's definition of "device," it points out that the Illinois eavesdropping statute prohibits using "an eavesdropping device, in a surreptitious manner," for recording private conversations. [141] at 8 (citing 720 ILCS 5/14-2(a)(1)–(3)). Of course, this does not mean that the federal Wiretap Act and the equivalent Tennessee statute contain a "surreptitious-purpose" requirement; they do not. *See supra*. Moreover, the Illinois statute's "surreptitious-manner" requirement is different from the "surreptitious-purpose" requirement that VLG argued in its opening brief, [131] at 19. It depends on the way the device was used, not the purpose for which it was designed. *See Henyard v. MV Transp.*, No. 1:15-cv-10835, 2020 WL 7027540, at *6 (N.D. Ill. Nov. 29, 2020).

Plaintiffs have produced enough evidence for a jury to conclude that VLG acted in a "surreptitious manner." Illinois's eavesdropping statute defines "surreptitious" as "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g). When those being recorded have been notified of the recording, the recording is not "surreptitious." For example, in *Henyard*, a bus driver alleged that her employer violated the eavesdropping statute when it recorded

her on video while she was driving. 2020 WL 7027540, at *2. There was a video camera in the bus that flashed different colors depending on whether it was recording or not. *Id.* The plaintiff had consented to being recorded when certain triggering events occurred, but she noticed that the lights on the cameras indicated that they were sometimes recording even when those triggering events had not occurred. *Id.* The court held that no reasonable jury could find that the defendant recorded her in a surreptitious manner if "the recording lights visibly turned on for the drivers to see." *Id.* at *6.

Similarly, in *Cook Au Vin, LLC v. Mid-Century Ins. Co.*, an employee of the defendant, an insurance company, called one of the defendant's customers and informed her that the call was being recorded for customer service purposes. 2023 IL App (1st) 220601, ¶ 4, 226 N.E.3d 694, 697. The plaintiff told the "employee that she "would prefer that the call … not be recorded." *Id.* Despite the plaintiff's objection, the court held that the recording was not "surreptitious" because the customer knew she was being recorded. *Id.* at ¶ 37, 226 N.E.3d at 704.

Conversely, a recording of a telephone call is "surreptitious" when made without informing those being recorded. *See Zeikos Inc. v. Walgreen Co.*, No. 23 C 303, 2024 WL 4691069, at *4 (N.D. Ill. Nov. 6, 2024). In *Zeikos*, one party to a call recorded the call without informing the other party. *Id.* at *1. The court, noting that the Illinois eavesdropping statute prohibits "using an eavesdropping device in a surreptitious manner," held that the party who recorded the call did so "in the exact manner that the [statute] prohibits." *Id.* at *3–*4.

Here, Alicea and Villagomez testified that VLG never informed its employees that their calls could or would be recorded. *See* [125-2] at 963:168:21–169:20; 1343:143:1. Indeed, VLG has identified nothing in the record like the flashing lights in *Henyard* or the oral notification in *Cook Au Vin* suggesting that its employees had reason to suspect their calls were being recorded. A reasonable jury could conclude that, if VLG had intentionally recorded its employees' calls, it did so "in a surreptitious manner" within the meaning of the Illinois' eavesdropping statute. 720 ILCS 5/14-2(a)(1)–(3).

### C. Statute of Limitations

VLG believes that plaintiffs' claims are barred by the relevant statutes of limitations. The parties dispute the length of the limitations period that applies to Illinois eavesdropping statute; whether the statute of limitations was tolled for each of the plaintiffs; and when each plaintiff's claims accrued. The Court addresses each dispute in turn.

#### 1. Applicable Limitations Periods

The parties agree that the federal Wiretap Act and the equivalent Tennessee statute have two-year statutes of limitations. [123] at 8 (citing 18 U.S.C. § 2520(e); and Tenn. Code Ann. § 39-13-603(d)); [131] at 24. For the Illinois statute, VLG says that the applicable limitations period is one year, [123] at 8, but plaintiffs say it is five years, [131] at 24. The district court previously assigned to this case held that a five-year limitation applies. [41] at 9–10 (citing *McDonald's Corp. v. Levine*, 439

N.E.2d 475 (Ill. App. Ct. 1982)).[19] The Court now adopts that holding, since VLG has not identified any new legal authority affecting its validity. *See Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("When there are no significant differences in the legal landscape since the prior ruling, courts may apply law of the case and refuse to reconsider the precise [] issue previously decided.").

**2. Tolling**

Plaintiffs contend that the limitations periods of their claims were tolled when Alholm signed a tolling agreement with VLG, [131] at 24, and again under *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), when Alholm filed this class-action lawsuit, [131] at 26. The Court addresses each argument in turn.

**a. Tolling Agreement**

On January 8, 2022, VLG agreed to toll the limitations period on any federal Wiretap Act claims or similar state-law claims brought by Alholm on behalf of himself and a class of similarly situated individuals from January 8, 2022, until March 9, 2022. [132-6] at 2–3 ¶ 2. On March 4, 2022, the parties extended the tolling period until April 7, 2022. [132-7] at 2–3 ¶ 2.

Plaintiffs say that Alholm's claims were timely because they were filed on April 7, 2022, before the end of the tolling period. [131] at 24. VLG does not contest the

[19] *McDonald's* held that a five-year limitations period applied under paragraphs 16 and 23 of the Illinois Limitations Act in force at the time. 439 N.E.2d at 480. Paragraph 16 of the Act was the catch-all statute of limitations. *Sharpe v. Jackson Park Hosp.*, 425 N.E.2d 1244, 1246 (Ill. App. Ct. 1981). Paragraph 23 provided the statute of limitations for cases of fraudulent concealment. *Dykema v. Dykema*, 412 N.E.2d 13, 14. (Ill. App. Ct. 1980). The current Illinois Code of Civil Procedure, including statutes of limitations, was enacted in 1982, Ill. Pub. Act 82-280, and the equivalent limitation provisions are now codified at 735 ILCS 5/13-205 (catch-all) and 735 ILCS 5/13-215 (fraudulent concealment).

existence or terms of the tolling agreement. *See* [141] at 5. It instead correctly points out that the agreement does not toll claims that expired before January 8, 2022, and contends that Alholm's claims already had expired by that date. [141] at 5 (citing *Bachman v. Bear, Stearns & Co., Inc.*, 57 F. Supp. 2d 556, 561 (N.D. Ill. 1999)). That argument depends on when Alholm's claims accrued, which the Court addresses below.

#### b. *American Pipe* Tolling

Plaintiffs argue that the applicable statutes of limitations were tolled when Alholm filed his first class-action complaint on April 7, 2022, [1], even for the claims of plaintiffs who joined the action later. [131] at 26 (quoting *Vanegas v. Signet Builders, Inc.*, 113 F.4th 718, 725 (7th Cir. 2024)). VLG does not contest the well-settled proposition that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class," *Am. Pipe*, 414 U.S. at 554, or the fact that the late-joining plaintiffs were "asserted members of the class." Rather, it again argues that any tolling has no effect on plaintiffs' claims because they had already expired before Alholm and VLG signed their tolling agreement on January 8, 2022. [141] at 7.

### 3. When Plaintiffs' Claims Accrued

Under the Alholm-VLG tolling agreements, [132-6]; [132-7], and *American Pipe*, 414 U.S at 554, plaintiffs' claims are timely if they would have been timely on January 8, 2022. That means that federal Wiretap Act claims and equivalent Tennessee claims—each subject to a two-year statute of limitations, 18 U.S.C. § 2520(e); Tenn. Code Ann. § 39-13-603(d) (2023) (repealed 2024)—must have accrued

after January 8, 2020. Illinois eavesdropping statute claims—subject to a five-year statute of limitations, *McDonald's Corp.*, 439 N.E.2d at 485; 735 ILCS 5/13-205—must have accrued after January 8, 2017.

Under all three applicable statutes of limitations (federal, Tennessee, and Illinois), claims accrue when a plaintiff is on inquiry notice of her claim. *See Davis v. Zirkelbach*, 149 F.3d 614, 618 (7th Cir. 1998); *see also Henderson Square Condo. Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 52, 46 N.E.3d 706, 720 (applying the "discovery rule" to 735 ILCS 5/13-205). That happens when the plaintiff has information that would reasonably lead her to investigate whether she has a claim. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995); *see also Healy v. Owens-Illinois, Inc.*, 833 N.E.2d 906, 910 (Ill. App. Ct. 2005) (holding that, under Illinois's "discovery rule," a claim accrues when a plaintiff is "possessed of sufficient information to cause plaintiff to inquire further in order to determine whether a legal wrong has occurred"). The question of when a plaintiff was put on inquiry notice is "one of fact, unless the facts are undisputed and only one conclusion may be drawn from them." *Henderson Square Condo. Ass'n*, 46 N.E.3d at 721; *see also Marks v. CDW Comput. Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997). The Court will assess the accrual of each plaintiff's claims in turn.

**a. Alholm**

VLG believes that Alholm was put on inquiry notice of his claim by a conversation with Conlee in March of either 2018 or 2019. [123] at 9; [141] at 5. Plaintiffs say that he was not on notice until a January 9, 2020, conversation with Chinua Gipson.

There is conflicting evidence of what was said during Alholm's conversation with Conlee. VLG first points to Alholm's answer in a related state-court case, in which Alholm "affirmatively aver[red] that [Conlee] stated to him in words or substance in March of 2019 that VLG was recording calls." [123] at 9 (quoting [125-2] at 758 ¶ 30). VLG would like the Court to treat that assertion as definitive because it is in a court filing, [123] at 9, but the Court declines to do so. Courts "may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017). But a fact must be indisputable to be judicially noticeable. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). For that reason, courts typically take judicial notice of facts about the litigation, such as the date on which a document was filed, not of facts asserted in parties' filings. *See ABN AMRO, Inc. v. Cap. Int'l Ltd.*, No. 04 C 3123, 2007 WL 845046, at *9 (N.D. Ill. Mar. 16, 2007). Nevertheless, the Court may, under Federal Rule of Evidence 801(2)(A), treat Alholm's answer as evidence—not necessarily definitive—of the matters asserted therein.

VLG also highlights Alholm's deposition testimony. [123] at 9. Alholm testified that Conlee told him that VLG was "recording calls … with the new phone system in the downtown office." [125-2] at 594:57:24–595:58:6. Alholm's testimony suggests that the conversation occurred in March of either 2018 or 2019. *Id.* at 595:60:21–22 (2018); *id.* at 598:70:2–4 (2019). Conlee's recollection differs; he testified that he merely asked Alholm whether call recording was legal. *Id.* at 63:61:1–64:62:8.

This conflicting evidence does not definitively establish that Alholm's conversation with Conlee gave him notice of his claim. There is a genuine factual dispute as to what was said in the conversation. A reasonable jury could conclude from Alholm's and Conlee's conflicting accounts that Conlee merely asked Alholm about the legality of call recording and never told him that VLG was already recording calls. Ironically, Conlee's account of the conversation, which favors Alholm on this issue, is the one that VLG asks the Court to believe elsewhere in its briefing. *See* [123] at 11; [133] ¶ 11; [142] ¶ 16. In any event, no reasonable jury could find that such a question would put Alholm on inquiry notice of his claim.

There is also conflicting evidence about Alholm's conversation with Gipson. According to Alholm, Gipson told him on January 9, 2020, that VLG was "recording all of the phone calls in the offices now," and Gipson could "pull them up and click on them and listen to them." *Id.* at 591:44:7–8, 596:65:24–597:66:6. This, Alholm said, was the first time that he believed that VLG was intentionally recording calls; until then, he believed that any recording had been "an innocent mistake." *Id.* at 597, 68:18–69:22. Because wiretapping and eavesdropping claims require intentional conduct, a reasonable jury could conclude based on this evidence that Alholm did not have inquiry notice of a claim until his conversation with Gipson.

VLG says that Alholm's conversation with "Gipson cannot be a basis to extend the limitations period" for two reasons. *First*, Gipson has refuted Alholm's testimony. [123] at 10. He testified that he never told Alholm that VLG was recording calls, [125-2] at 820:32:23–821:33:10, and was not aware of any call recording by VLG when he

worked there, *id.* at 815:27:11–816:28:4. Gipson said the same, unequivocally, in a February 2020 email to Alholm. [133] ¶ 76. But, though this evidence conflicts with Alholm's testimony, it doesn't negate it. It simply creates a genuine factual dispute.

*Second*, VLG suggests, starting the limitations period with the Gipson conversation would vitiate the statute of limitations entirely. VLG reasons that the Conlee conversation triggered Alholm's duty to investigate his claim, so starting the limitations period with the Gipson conversation would essentially allow Alholm to "reset [the]limitations clock" every time he received new evidence of call recording. [123] at 11–12. That argument does not work; it assumes that there is no genuine factual dispute about whether the Conlee conversation put Alholm on notice of his claim—but there is.

Indeed, there is sufficient evidence for a reasonable jury to conclude that Alholm did not have inquiry notice of his claim until January 9, 2020, just inside the two-year window needed for his federal and Tennessee wiretap claims to be timely and well inside the five-year window needed for his Illinois eavesdropping claim.

**b. Del Real and Alicea**

VLG next argues that the claims of Del Real and Alicea accrued "no later than 2020," [123] at 12, making their claims stale by the time they joined the lawsuit in August 2023. [123] at 12 (citing [53]). But that argument erroneously assumes that Del Real's and Alicea's claims were not tolled by Alholm's tolling agreement or under *American Pipe*. As explained above, the claims of putative class members have been tolled since January 8, 2022, so they are timely if they accrued after January 8, 2020.

A reasonable jury could conclude that Del Real's and Alicia's claims did accrue after that date. *See* [123] at 12. Del Real said she told Alicea about the recordings of her calls immediately after discovering them. [125-2] at 867:45:24–46:16, 869:55:8. That happened sometime between "the end of 2019" and "March … of 2020." *Id.* at 867:45:3–21. Additionally, plaintiff's expert testified that January 28 "could indicate the time that the [39 recording files that Del Real downloaded] [were] created." *Id.* at 1559, 42:12–16. From this evidence, a jury could reasonably conclude that Del Real discovered and told Alicea about the call recordings on January 28, 2020. VLG does not argue otherwise, nor does it suggest that Del Real somehow had notice of her claims before discovering the recordings. *See* [123] at 12.

VLG does contend, however, that Alicea had earlier notice of her claims because, she "had always felt" that "pretty much everything [she] did was being recorded." *Id.* at 12–13 (citing [125-2] at 958:149:15–19). But mere suspicion is not enough. *See Bommiasamy v. Poola*, No. 21 C 6378, 2022 WL 22894895, at *5 (N.D. Ill. Nov. 2, 2022) (citing *Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 100 (Ill App. Ct. 2011)). Inquiry notice requires information that would cause a reasonable person to investigate whether she had a claim. *Whirlpool Fin. Corp.*, 67 F.3d at 609.

Alicea testified that her feeling was based on VLG's "many cameras watching our every movement in all [VLG's] offices." [125-2] at 958:149:6–8. The question, then, is whether a reasonable jury could find that those cameras would cause a reasonable person to investigate whether they had a wiretap claim. *Whirlpool*, 67 F.3d at 609. VLG says that it must, if plaintiffs can argue, as they do, that evidence of the many

cameras supports their wiretapping claims. *See* [141] at 6 (citing [131] at 19–20). But that argument is not self-evident—whether evidence is probative of a plaintiff's claim is a different question than whether information is sufficient to give inquiry notice of the claim—and VLG offers no legal authority to support it. *See* [123] at 13; [141] at 6.

Nor does VLG offer any other legal authority showing that the presence of cameras would, as a matter of law, cause a reasonable person to investigate whether she had a wiretapping claim. *See id.* That failure is especially significant because Alicea's testimony about how she "had always felt," [125-2] at 958, 149:15–19, is alloyed by her testimony that she had not seen or heard about any call recording until she saw the recording files that Del Real had found, *id.* at 931:43:17–932:44:15, 932:47:5–18, and that VLG had not done anything that Alicea "thought was illegal," *id.* at 932:44:16–19. The evidence, mixed as it is, creates a genuine factual dispute. A reasonable jury could conclude that neither Alicea nor Del Real had inquiry notice of their claims until after January 8, 2020.

**c. Gallagher**

VLG argues that Dan Gallagher had inquiry notice of his claims "within months of … beginning to work" at VLG in March 2018, [133] ¶ 47, when he saw a "television set with all those different … places in the offices," [125-2] at 1108:108:15–22, in Eddie Vrdolyak's office, *id.* at 1090:36:21. Unlike Alicea, Gallagher testified that multiple occurrences bolstered his suspicions. For instance, "[s]ometimes when [he] would talk on the phone to [his] secretary," Peter or Eddie Vrdolyak would call "shortly thereafter … asking [him] about the same case." *Id.* at 121:1–13.

Additionally, a few weeks after he left VLG in September 2019, [133] ¶ 47, Gallagher called one of VLG's receptionists to ask about a folder that he had left behind, and, shortly after, the receptionist's boss told the receptionist, "Dan Gallagher just called here. You talked to him. Don't talk to him again." *Id.* at 1117:144:13–1118:147:21.

This evidence reasonably supports the conclusion that Dan Gallagher had inquiry notice of his claims before he left VLG in 2019. Plaintiffs present no argument or evidence to the contrary, so there is no genuine factual dispute. *See* Fed. R. Civ. P. 56(c)(1)(A). Gallagher's federal and Tennessee claims are thus time barred, but his Illinois claim is not.

**d. Penny Jackson**

VLG concedes, and plaintiffs do not dispute, that plaintiff Jackson "became aware of allegations about VLG recording calls within a few days of … January 24, 2020." [123] at 15; [133] ¶¶ 56–57. VLG does not argue that Jackson's claims accrued at any other time. A reasonable jury could therefore conclude that Jackson's claims accrued after January 8, 2020, making them timely.

**e. Smith**

It is also undisputed that sometime before a conversation in October 2022 and January 2023, plaintiff Smith formed a belief that VLG had been recording calls based on having been twice reprimanded: once for not following a script when informing prospective clients that VLG would not be taking their cases, and once for advising a coworker to call Grant Stoffle about a payroll issue. [133] ¶¶ 63–65. He testified that he did not believe that he would have been reprimanded either time if VLG had not been monitoring his calls, [125-2] at 1407:92:4–8, even though the

conversation at issue in the second incident was not over the phone, *id.* at 93:2–8. But Smith did not testify that while he worked at the firm (from January 2019 through November 2020, [133] ¶ 64), he believed that it was recording calls. Rather, he testified that he believed the allegations of call recordings made in this lawsuit because "[l]ooking back at events, it was the only explanation for some of them." [125-2] at 1404:79:16–8017. In other words, Smith's testimony creates a genuine factual dispute as to when he first believed VLG had been recording phone calls.

The Court must also ask whether the incidents forming the basis of his belief would have, at the time they happened, caused a reasonable person to investigate further. Smith only testified about two occasions on which he was reprimanded for things he said, *id.* at 1407:92:4–8, and only one of those was for something he said over the phone, *id.* at 1407:93:2–8. Contrast Smith's one supposedly overheard telephone conversation with Gallagher's multiple overheard conversations. Too, note that Smith, unlike Gallagher, did not testify that he had seen the television monitor in Eddie Vrdolyak's office, *id.* at 1108:108:15–22, 1090:36:21. He did not even testify, as Alicea did, that he was aware of VLG's security camera network. *Id.* at 958:149:15–19.

Ultimately, the record suggests that the information Smith had before learning about this lawsuit amounted to one telephone conversation for which he was reprimanded and one non-telephone conversation for which he was reprimanded. A reasonable jury could find that information insufficient for Smith to have inquiry notice of his claims. By extension, it could conclude that Smith did not have inquiry

notice until sometime after he left VLG in November 2020, [133] ¶ 64, which would make his claims timely.

#### f. Villagomez

VLG thinks Villagomez's claims were untimely because she believed "that there were cameras everywhere," and "we were being watched." [125-2] at 1324:67:10–14. But it is undisputed that Villagomez never heard any recordings of calls while working at VLG or heard anyone else say they heard such a call. [133] ¶ 70. She believed only that "it was a possibility" that VLG was recording calls, so she "didn't use the phone for personal use or private conversations" starting when VLG switched to a new phone system. [125-2] at 1333:101:9–16, 1333:102:1–6. She also testified that there were "whispers about calls being monitored and recorded," *id.* at 1323:62:19, but clarified that she meant "[m]ore like people didn't feel comfortable … speaking freely on the company phone," *id.* at 1323:62:22–63:4. She acknowledged that those people worked in shared spaces where others could hear them, although that was "not likely" the reason they did not speak freely. *Id.* at 1324:64:16–19. She also testified that she and others were even more fearful of using the phone after Alholm accused VLG of recording phone calls. *Id.* at 1340:129:10–13.

Distilling this testimony, the only pieces of information about call recording that Villagomez possessed, at least until Alholm leveled his accusations at VLG, were that some people that she worked with—who worked in a shared space, *id.* at 1324:64:16–19—didn't feel comfortable speaking freely on calls from their work phones, *id.* at 1323:62:22–63:4, and that she was "being watched" by "cameras everywhere," *id.* at 132467:10–14. A reasonable jury could conclude that such

information would not cause a reasonable person to investigate wiretapping claims and that Villagomez did not have inquiry notice of her claim until Alholm accused VLG of recording calls on January 19, 2020. *Id.* at 851. That would make her claims timely.

## IV. Conclusion

For the foregoing reasons, VLG's motion for summary judgment [123] is granted with respect to Gallagher's claims under 18 U.S.C. § 2511 and section 39-13-601 of the Tennessee Code. The motion [123] is denied with respect to all other claims. The Court sets a status hearing on 5/18/2026 at 9:30 a.m. to set a trial date and to update the Court on the status of settlement discussions.

ENTER:

Georgia N. Alexakis
United States District Judge

Date: 5/1/2026